

JUDGE FURMAN

UNITED STATES DISTRICT COURT **14 CV 8810**
SOUTHERN DISTRICT OF NEW YORK

---

MARK OWEN,

                 Plaintiff,

           -against-

KEVIN PODLASKI and
CARSON BOXBERGER, LLP,

                 Defendant.

Civil Action No.:

**COMPLAINT**

JURY TRIAL DEMANDED

RECEIVED NOV 05 2014 U.S.D.C. S.D. N.Y. CASHIERS

---

       Plaintiff Mark Owen, through his attorneys, McKool Smith P.C., brings this Complaint against Kevin Podlaski and Carson Boxberger, LLP ("Carson Boxberger," and collectively the "Defendants"). This Complaint is filed subject to the contemporaneously filed Motion for Leave. Except as otherwise indicated as to his own actions and conduct, Plaintiff alleges upon information and belief as follows:

## NATURE OF THE ACTION

       1. This legal malpractice case arises from Defendants' legal representation of Plaintiff in connection with the publication of his best-selling book, *No Easy Day: The Firsthand Account of the Mission That Killed Osama Bin Laden* (2012). (the Book). Defendants' legal representation included the duty of advising Plaintiff on his contract with Dutton, the New York publisher, and the duty of ensuring the Book (to be published in New York) would comply with Plaintiff's contractual and fiduciary obligations to the United States to preserve confidential and classified or otherwise sensitive information learned as a result of Plaintiff's prior service in the United States military as a Navy SEAL.

       2. Defendants breached the duties they owed to Plaintiff by, among other things, advising Plaintiff that he could and should forego a prepublication review of his book with

1

the Department of Defense and other governmental agencies and by advising Plaintiff that they had could and did review the book and remove all classified or otherwise sensitive information and Plaintiff could, therefore, publish the book without civil or criminal exposure. Defendants were wrong on both aspects of their advice.

3. Plaintiff has suffered and will continue to suffer significant damages as a direct and proximate cause of the Defendants' breach of their duties as attorneys for Plaintiff, as described below.

## PARTIES

4. Plaintiff Mark Owen is an individual citizen of the State of Texas. At the time of the events giving rise to the claims asserted herein, he was a citizen of the Commonwealth of Virginia. He is not now and has never been a citizen of the State of Indiana.

5. Defendant Kevin Podlaski is a lawyer formerly with the law firm of Carson Boxberger, LLP of Fort Wayne, Indiana. He is a citizen of the State of Indiana. He is the former attorney for Plaintiff Mark Owen.

6. Defendant Carson Boxberger, LLP is a law firm practicing as a limited liability partnership, organized and existing under the laws of the State of Indiana. It is a citizen of the state of Indiana. All offices of Carson Boxberger are within the State of Indiana and on information and belief all partners of Carson Boxberger and citizens of the State of Indiana and none are citizens of Texas.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of costs, exceeds $75,000.

8.     This Court has personal jurisdiction over Defendants under the New York long-arm statute; New York Civil Practice Law and Rules ("CPLR") §§ 302(a)(1) and 302(a)(3)(ii). "Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits." *Cutco Industries v. Naughton,* 806 F.2d 361 365 (2d Cir.1986); *see also Arrowsmith v. United Press International,* 320 F.2d 219 223 (2d Cir.1963) (en banc).

9.     Defendants transacted business within the state, contracted to provide legal services, and did provide legal services within the state - within the jurisdictional limits of the Southern District of New York. A copy of the engagement letter between Plaintiff and Defendants is attached as Exhibit 1 and is incorporated for all purposes.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(2) because a substantial part of the events and omissions that give rise to the claims herein occurred in New York. The contract between Plaintiff and Dutton, a division of Penguin Group (USA) Inc was formed under New York law, Defendants engaged in telephonic and electronic communications with Dutton, which was located in New York, and was paid by Elyse Cheney Literary Associates, LLC, which was located in New York.

## FACTUAL BACKGROUND

11.    Plaintiff is a decorated retired Navy SEAL. He served thirteen (13) consecutive combat deployments and was repeatedly in harm's way, side by side with his brother SEALs and others serving this country in the military. During Plaintiff's military service, he participated in probably the two most famous missions in SEAL history: the missions resulting in the rescue of Captain Richard Phillips from Somali pirates in 2009, and the death of Osama Bin Laden in 2011. Both missions became the subject of successful books and films and

millions of dollars have been made telling the stories (not always accurately) of these brave SEALs, but none of it went to the SEALs or their families.

12.     After observing that these missions—particularly the Bin Laden mission—were being written about and discussed inaccurately by people who did not know the facts and, even worse, were being exploited to advance personal and financial agendas rather than highlight the bravery and sacrifice of his brother Navy SEALs, Plaintiff decided to write his own book. *No Easy Day* tells the story of these missions from the perspective of the Navy SEALs—a perspective available only to a SEAL.

13.     From the beginning, Plaintiff intended to donate a substantial portion of any sales proceeds from the Book to charity. Plaintiff announced in the Book that a major portion of its sales proceeds would be donated to designated charitable organizations devoted to caring for the families of fallen SEALs and Plaintiff encouraged others also to donate.

14.     In writing the Book, Plaintiff was acutely aware of the risk that his Book if it disclosed sensitive information, could putt a brother SEAL in harm's way. He was devoted to not disclosing anything he thought could be used by America's enemies. To insure he complied with all his obligations of confidentiality, he sought out legal counsel to advise him. Plaintiff was assisted in his search for legal counsel by his literary agent and publisher (both based in New York), who referred Plaintiff to Defendants Kevin Podlaski and the law firm, Carson Boxberger. The publisher had apparently worked with Defendants on other books published in New York and Defendants claimed to have special expertise in dealing with military law and special operations issues. Podlaski professed to have vetted several other books for retired military and claimed to have a level of security clearance that would allow him to advise Plaintiff and the writing team on all issues arising from Plaintiff's desire to tell the story of the SEALs.

4

15.     In mid-January 2012 Defendants drafted their engagement letter to provide legal services to Plaintiff. Defendants addressed their engagement letter initiating the attorney-client relationship to Plaintiff in care of his literary agent in New York, who was also the primary client contact for Plaintiff. Virtually all communications to Plaintiff were sent to her. Defendants' engagement letter required bills for the representation to be sent in care of the literary agent in New York and Defendants' bills were in fact sent to and paid from Plaintiff's literary agent in New York.

16.     The engagement letter details their duties to Plaintiff and he signed it on January 18, 2012, formalizing the legal relationship.

17.     Pursuant to the engagement letter, Defendants' first task was to provide legal representation with respect to "contracting with Dutton, a division of Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014 ("Publisher"), for the publication of your manuscript about your career as a member of the U.S. Navy SEALS" and assist Plaintiff in the negotiation of a contract with terms favorable to Plaintiff. From late January through early February 2012, Defendants engaged in numerous communications on Plaintiff's behalf concerning the contract and ultimately a contract was signed. Plaintiff's contract with Dutton (on which Defendants advised Plaintiff) was performable wholly in New York and was governed by the laws of New York. The negotiated contract failed to include key provisions, howeer, that would have protected Plaintiff should the prepublication review process required by the U.S. Government cause publication delays and/or other problems due to requested redactions.

18.     Under the terms of Defendants' engagement letter, Defendants' next task was to "review the publishable manuscript of [Plaintiff's] career to ensure [his] compliance with [his] obligations under any agreements [he] may have signed with the U.S. Government not to release

classified or classifiable information or otherwise compromise the national security interests of the United States, as those terms are used, intended or understood in Standard Form 312, Confidential Information Non-Disclosure Agreement (CINA"), or any other such agreements."

19.     Defendants knew that the legal advice they were giving Plaintiff concerning his fiduciary and contractual obligations regarding classified or otherwise sensitive information would be relied upon not only by Plaintiff but also by his literary agent, co-writer, and publisher, and was a matter of critical importance to all citizens of New York.

20.     In the "Author's Note" at the beginning of the Book, Plaintiff explained the efforts to which he went to ensure his compliance with his confidentiality obligations and his hiring of Defendants.

*Although I am writing this book in an effort to accurately describe real-world events as they occurred, it is important to me that no classified information is released.* **With the assistance of my publisher, I hired a former Special Operations attorney to review the manuscript to ensure that it was free from mention of forbidden topics** *and that it cannot be used by sophisticated enemies as a source of sensitive information to compromise or harm the United States. I am confident that the team that has worked with me on this book has both maintained and promoted the security interests of the United States.* (Emphasis added.)

21.     Defendant Podlaski and his firm are the attorneys Plaintiff referred to in his Author's Note. In fact, it was Podlaski himself who drafted the portion of the Author's Note quoted above to reflect the substance of his advice.

22.     Defendants apparently did not know what nondisclosure agreements someone in Plaintiff's position would have signed and failed to undertake any efforts to independently verify which secrecy, non-disclosure agreements Plaintiff had executed with the U.S. Government to determine his legal obligations regarding prepublication review.

23.     Notwithstanding their lack of knowledge of what Plaintiff might have signed, Defendants told Plaintiff and the support team, including his literary agent and publisher, that

6

Plaintiff had no obligation to submit the Book to the Department of Defense or any other agency for a prepublication review. Defendants in fact affirmatively advised Plaintiff not to submit the Book for a prepublication review.

24.     Defendants represented that, through their review of Plaintiff's manuscript, Plaintiff could satisfy his obligation to protect disclosure of classified or otherwise sensitive material. Defendant Podlaski's stated reason for this was his security clearance from the United States government, which enabled him to vet the Book for classified or otherwise sensitive information.

25.     Defendants repeatedly conveyed their advice concerning Plaintiff's book jointly to Plaintiff, his literary agent, co-writer, and publisher by sending communications to New York.

26.     At no time, however, did Defendants inform Plaintiff adequately of the risks and consequences to Plaintiff (and others) if Defendants were wrong about Plaintiff's obligation to submit the Book to a prepublication review. At no time did Defendants adequately inform Plaintiff of the risks and consequences to Plaintiff if Defendants were wrong about their ability to cleanse the Book of classified or otherwise sensitive information. Not only did Defendants fail to inform Plaintiff adequately so Plaintiff could make an informed decision about submitting the Book to prepublication review, Defendants affirmatively downplayed the risk and consequences of following their advice to forego prepublication review and instead let them cleanse the Book of classified or otherwise sensitive information.

27.     As a result of Defendant's failure to inform Plaintiff adequately, Plaintiff was never in a position to make an informed decision and Plaintiff ultimately relied upon the faulty advice of Defendants and did not submit the Book for prepublication review. Plaintiff and his

entire writing team relied upon Defendant Podlaski's advice in deciding not to submit the Book for prepublication review.

28.     Defendant Podlaski reviewed the manuscript in late-June 2012, making nominal edits, adding a forward and including citations to the public record. There was and is, however, no legal basis for Podlaski's representation that he could review the Book for classified or otherwise sensitive information.

29.     On June 27, 2012, upon completion of his review and editing, Defendant Podlaski forwarded a copy of the revised manuscript to Plaintiff and the publisher with his assurance that if Plaintiff made Podlaski's suggested changes, the manuscript would contain no classified or otherwise sensitive information, would not breach Plaintiff's contractual or fiduciary obligations, and would not result in civil or criminal exposure to Plaintiff, the publisher, or others on the team.   Although Plaintiff adopted the changes that Defendant Podlaski proposed, Podlaski's advice was again negligent and incorrect.

30.     The task Defendants purported to undertake for the benefit of Plaintiff and his writing team was absolutely contrary to law and doomed to failure from the start. Defendants failed to appreciate or explain to Plaintiff and the others relying on Defendants the difference between (1) having a security clearance that could allow an individual to be determined by an agency of the U.S. Government to have a "need to know" classified or otherwise sensitive information and view a document and (2) having actually received permission to view a potentially classified or otherwise sensitive document created by the Plaintiff.

31.     While Defendant Podlaski may have once held or even still hold a security clearance, he had no permission from the United States government to read the manuscript and the classified or otherwise sensitive information within the Book. Defendant Podlaski likewise

had no legal right to substitute his judgment for that of the Department of Defense or other agencies of the United States as to what is considered classified or otherwise sensitive information. Yet he purported to make that very decision in connection to his review and editing of Plaintiff's manuscript.

32.     In the days and weeks leading up to the publication of "No Easy Day" publicity surrounding the Book began to build. Within days of the release of the book, Plaintiff, his literary agent, and the publisher received inquiries from media outlets concerning reports that Government sources considered the Book to be in violation of Plaintiff's secrecy obligations and would result in civil and criminal proceedings by the United States government. Plaintiff and his writing team forwarded these inquiries to Defendants. Despite mounting evidence to the contrary, Defendants continued to maintain that the manuscript need not be submitted to anyone for prepublication review. For example, Defendant Podlaski erroneously noted on August 23, 2012 that because Plaintiff was not on active duty when he wrote the manuscript, he had no obligation to submit the manuscript for prepublication review.

33.     On or about August 30, 2012 (one business day before the scheduled release), Jeh Johnson, the General Counsel of the Department of Defense, wrote the publisher to tell the writing team that the Book violated Plaintiff's fiduciary and contractual obligations because Plaintiff had not submitted the Book for a prepublication review and because the Book contained classified or otherwise sensitive information.

34.     Mr. Johnson's letter was sent to Defendants who dismissed Mr. Johnson's letter as an attempt at intimidation and said, "we should not worry." Defendants continued to defend the correctness of their advice to avoid prepublication review and they also continued to maintain that the Book contained no classified or otherwise sensitive information. Defendants even

suggested that the writing team embrace the accusations against Plaintiff because it would result in greater book sales.

35.     At the time of Mr. Johnson's letter, tens of thousands of copies of the book had already been printed and distributed across the country in anticipation of the release date. Plaintiff and the writing team had no choice but to continue to rely upon the advice of Defendants.

36.     *No Easy Day* was published on September 4, 2012.

37.     Following the Book's publication, and as a direct and proximate cause of the acts of Defendants described herein, the U.S. Government has claimed that the Book contains classified or otherwise sensitive information and it has opened a criminal investigation into Plaintiff's disclosures. Additionally, the U.S. Government has asserted that Plaintiff violated his contractual obligation to submit his manuscript for a classification prepublication review and has threatened a civil forfeiture lawsuit.

38.     After the release of the Book, Defendants continued to represent Plaintiff and defend their advice in the face of this brewing legal storm, at one point saying of the Department of Defense's position that prepublication was required, "It's bull#@*#." Defendants' continued representation of Plaintiff included making certain Freedom of Information Act requests on his behalf on November 13, 2012 and emailing Plaintiff on the status of these "FOIA" requests as late as May 9, 2013. Although Defendants never officially terminated the attorney-client relationship, Defendants' efforts to help Plaintiff deal with the mess they had created apparently ended ceased with this May 13, 2013 communication.

39.     In recognition of the fact that, by relying upon the advice of Defendants not to submit the Book for prepublication review, Plaintiff apparently breached his contractual and

fiduciary obligations, Plaintiff has agreed, as part of a negotiated settlement, to forfeit to the U.S. Government the majority of all income he has received from his Book as well as all future income he otherwise would have received. This payment is growing daily and is currently in excess of $4,500,000.00. Plaintiff will also lose all movie rights and the income attributable to those rights, believed to be in excess of $900,000.00 and he has suffered damages in connection with lost book sales of his second book, *No Hero*.

40.      As a direct and proximate cause of the acts of Defendants described herein, Plaintiff has been forced to retain counsel to represent him on the numerous legal issues that have arisen, including, without limitation, the threatened suit for civil damages as well as the criminal investigation arising from Plaintiff's inadvertent disclosure of classified or otherwise sensitive information (despite Podlaski's contrary assurances). Plaintiff has expended a significant amount of money in legal fees to try to clean up the mess caused by the advice of Defendants and he is still involved in that process and still incurring legal fees. It is anticipated that his legal fees will exceed $500,000.00.

41.      As a direct and proximate cause of the acts of Defendants described herein, Plaintiff has had his reputation and his exemplary military record tarnished by the false accusation that he sought to profit from disclosure of classified or otherwise sensitive information. In addition, Plaintiff will lose his security clearance for his not having submitted the Book to prepublication review. Because of this damage to his reputation, and the loss of his security clearance, Plaintiff has lost a significant amount of income he otherwise would have received following his retirement from the military by way of consulting jobs, speaking engagements, and future employment. This loss of income will continue into the future for years.

42.     The precise amount of Plaintiff's damages cannot now be determined with precision because they are ongoing and will continue for some time into the future. Plaintiff's total damages are, however, estimated at this time to be in excess of $8,000,000.00.

## FIRST CAUSE OF ACTION
Professional Negligence/Malpractice

43.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if they were set forth fully herein.

44.     Plaintiff had an attorney-client relationship with the Defendants. Defendants owed Plaintiff the duty act on his behalf as a reasonable and prudent attorney would act under the same or similar circumstances.  Defendants held themselves out as experts, experienced and qualified to advise Plaintiff in connection with his secrecy, non-disclosure agreements and book publication obligations, and they committed to him that their representation would be up to the highest legal and ethical standards.  As a result, Defendants have voluntarily assumed (and breached) an even higher standard of care.

45.     The above-described acts of Defendants constitute a breach of the standard of care that Defendants owed Plaintiff. In addition, these acts constitute a breach of the higher standard of care Defendants voluntarily assumed when they committed in the engagement letter that their representation of Plaintiff would be "to the highest legal and ethical standards."

46.     By their negligence, Defendants committed Plaintiff to a conflict with the U.S. Government that he could not win. As a direct and proximate result of the negligence of Defendants, Plaintiff has suffered the losses described herein.

47.     It has become necessary for Plaintiff to retain the undersigned counsel to prosecute these claims on his behalf and Plaintiff seeks an award of reasonable attorney's fees, if and as allowed by law.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(a)     Compensatory damages in an amount to be proven at trial; and

(b)     Such other and further relief as this Court deems just and proper, together with all

costs, fees, pre and post judgment interest and disbursements relating to this proceeding.

# Demand For Trial By Jury

Plaintiff demands a trial by jury for all issues so triable as a matter of right.

Dated: November 5, 2014
     New York, NY

MCKOOL SMITH, P.C.

By: _____
     Matthew I. Fleischman

One Bryant Park, 47th Floor
New York, NY 10036
mfleischman@mckoolsmith.com
(t) (212) 402-9400
(f) (212) 402-9444

Coyt Randal Johnston (*Motion for Admission Pro Hac Vice to be Filed*)

Johnston-Tobey, P.C.
3308 Oak Grove Avenue
Dallas, Texas 75204
pwilliams@mckoolsmith.com
(t) (214) 741-6280
(f) (214) 741-6248

*Attorneys for Plaintiff*

# EXHIBIT 1



**Carson**
**Boxberger**
**Attorneys**

1400 ONE SUMMIT SQUARE
FORT WAYNE, IN 46802
CARSONBOXBERGER.COM

Kevin P. Podlaski, Esq.
podlaski@carsonboxberger.com

January 17, 2012

**ATTORNEY—CLIENT**
**PRIVILEGED MATERIAL**
**Sent Via Email**



(Printed Name of Client)

c/o Elyse Cheney
Elyse Cheney Literary Associates, LLC
78 Fifth Avenue, Third Floor
New York, NY 10011

Re:     Engagement/Representation Letter

Dear Sir:

We are pleased that you have selected our firm to provide legal services to you. You asked me to assist you with the legal issues you may encounter in:

- Contracting with Dutton, a division of Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014 ("Publisher"), for the publication of your manuscript about your career as a member of the U.S. Navy SEALS; and

- Reviewing the publishable manuscript of your career to ensure your compliance with your obligations under any agreements you may have signed with the U.S. Government not to release classified or classifiable information or otherwise compromise the national security interests of the United States, as those terms are used, intended or understood in Standard Form 312, Confidential Information Non-Disclosure Agreement (CINA"), or any other such agreements.

The following confirms and details our agreement and describes the scope of my representation, the fees and expenses, and the conclusion of our representation. This is the contract between you and my law firm for the payment of legal fees you will incur for my legal



EXHIBIT
**1**

KP00001

representation of you. Please thoroughly review it, and if you are in agreement with the terms, sign it and return the original to me via the FED EX. If there is anything you disagree with or don't understand, please let me know before you sign it.

Scope of Representation. As discussed, I am the attorney in charge of these legal matters and I will be responsible for the day-to-day management of your interests as defined above. By signing below, you are specifically acknowledging that no promises have been made by me as to what result we can or will achieve for you. My acceptance of this engagement does not involve an undertaking to represent you or your interests in any other matter. We both recognize that you have not asked me for legal advice or consultation beyond the specific requests that I represent you in the matters stated above. I will, of course, be happy to discuss and provide such additional legal services you may request from time to time and I will provide you with written confirmation of any such additional engagements for which you retain me.

Communication; Copies of Documents. I will try to keep you informed at all times as to the status of all matters I am handling for you and the course of action begin followed or recommended by me. If, however, you are unsure as to the status of any matter, it is also your responsibility to contact me and inquire. At your request, I will send you copies of any written materials sent or received by me pertaining to your matters, at your expense. Because you have e-mail, I will send certain correspondence and documents to you via e-mail rather than through the U.S. Post Office. As you know, this is a quicker and more efficient way of communicating. Of course, copies of any documents not generated in this office, along with correspondence from any Court or opposing counsel, will be sent to you via regular mail.

Fees and Expenses. I will bill you monthly for the legal services we provide to you. Unless you direct otherwise, I will send the monthly billing/invoices to you, care of Elyse Cheney, at Elise Cheney Literary Associates, LLC, at this address: 78 Fifth Avenue, Third Floor, New York, NY 10011.

Our charges for professional services are based on the type of work and the amount of time required for the work. We bill for our services in $1/10^{th}$ an hour increments. The fees are based on time actually spent in your representation (including court waiting time and travel, if applicable) according to our standard hourly rate. The fees that I charge are billed at the hourly rate in effect during the month services are performed. My current hourly rate is $300.00.

You may pay your bill/invoice using a Master Card or Visa credit card. If you choose this method of payment, please include your name as it appears on the card, the account/card number, expiration date, and three or four digit security code from the back of the card. No amounts will be charged until you authorize the amount. Accordingly, miscellaneous expenses, if any, are to be billed directly to you unless you authorize miscellaneous bills to be charged to the card after receiving our miscellaneous billing statement. You may instead, make arrangements with our Billing Department Manager, Connie Schnelker, for paying these fees.

I will be primarily responsible for these matters. However, some aspects of these matters may be referred to other attorneys in this office when appropriate and in the interest of

KP00002

effectiveness and efficiency. The hourly rate for other Partners is $250, and Associates is $200 an hour. Also, some of our professional staff may assist me with your matters. Our paralegal current hourly rate is $150. It is obviously to your economic advantage to have these professionals assist me whenever prudent. Nonetheless, prior to being submitted to you all work is reviewed by me as your attorney.

Our monthly invoices will include separate charges for disbursements made and internal charges incurred on your behalf. These may include such items as travel expenses, postage and delivery service fees, charges for long distance telephone calls and faxes, and duplicating charges associated with our representation of you in this matter. We will bill you at cost for charges paid to third parties, and charges for internal services will be billed at our usual and customary rates for such services. You will receive monthly statements showing the status of your account. Payment of any balance due is expected within 15 days of the billing date. In the event this account has a balance due for a period in excess of 30 days, interest will be charged on that amount.

One reason for monthly billing is to give you an opportunity to bring any problems to my attention. You should carefully and immediately review your bills upon receipt. Bring any objections you might have to my attention within 15 days of the date of the statement. Otherwise, all objections to the charges will be deemed waived. If, for some reason, you do not pay our invoices in a timely manner, we may be forced to withdraw our representation. In addition to the fees, expenses and any interest that may be imposed on past-due accounts, you will also be responsible for costs and expenses (including legal fees) of collection. Further, we reserve the right to assert a retaining lien over all documents or property in our possession, as contemplated and allowed under the Rules of Professional Responsibility for Attorneys, Rule 1.16d and the common law. If it is necessary for us to institute a legal action to collect our fees and expenses from you, then by signing below you also agree and consent to jurisdiction of the matter in the Allen County, Indiana court system, under Indiana law.

From time to time, it may be necessary to incur certain expenses on your behalf. However, I will not incur any expenses in excess of $500.00 without your consent. Fees generally are not paid by us, but are instead, directly billed to you unless other arrangements are made by and agreed to between us.

Client Responsibilities. You agree to pay us for the performance of the legal services described above, in accordance with the terms of this letter agreement. You also agree to cooperate fully with us and to provide us with all information known by or available to you that may be relevant to your matters or that may aid us in representing you in these matters.

Conflicts. We agree not to accept, without prior approval from you, any engagement known by us to be in direct conflict with your interests in matters we are handling for you. We may represent new and existing clients in any matter that is not substantially related to your work for you even if the interest of such clients may be adverse to you but we will not knowingly give any other client the benefit of non-public information we received from you to your detriment. We begin our work for you relying on the fact that neither of you nor we know of any conflicting

KP00003

interests, or any likely future conflicting interests, among your management or owners, or between your company and any other client of our firm.

Conclusion of Representation. Either you or I may terminate the engagement at any time for any reason by written notice. My termination of work for you must be in strict accordance with my professional obligations to you under the Rules of Professional Responsibilities for Attorneys. Unless previously terminated, my representation of you will terminate upon completion of the services for the matters described above. And, unless you engage us after termination of these matters, we will have no continuing obligation to advise you with respect to future legal developments, such as changes in the applicable laws or regulations which could have an impact on your future rights and liabilities.

Confidentially. Our relationship with you is confidential, and we will keep confidential all sensitive, proprietary, or otherwise confidential information relating to you and your matters. Following the conclusion of our representation, we will keep confidential any non-public information you have supplied to us which we will retain in accordance with Rules of Professional Responsibility for Attorneys. At your request, we will return your papers and property to you promptly upon receipt of payment for outstanding fees and costs. The firm will retain its own files pertaining to the matter in accordance with the firm's records retention program. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any such documents or other materials after a reasonable time following the termination of the engagement.

Press Releases and Publicity. After your case is concluded, we may publish on our firm's website or in promotional materials, our representation of you. Of course, we will not disclose your identity or name. And our release of information will be in strict compliance with the Rules of Professional Responsibility for Attorneys. By signing below you authorize Carson Boxberger LLP to list the general nature of this representation in our various promotional materials.

Outcome of Representation. Although I cannot guarantee a certain outcome, I am confident that my experience and tenacity will afford you a satisfactory conclusion of these matters as I use my reasonable best efforts in representing you. Above all, I will make every effort to handle your case efficiently and according to the highest legal and ethical standards.

If you do not understand any aspect of this Agreement, please discuss it with me so you have a full understanding. Your acknowledgment of all of the terms of this contract induces me to accept your case and act as your lawyer. I do not anticipate disputes concerning legal fees, as I have rarely had them. We must have a true meeting of the minds, and by achieving that, we will have a professional relationship of the highest quality.

If the foregoing reflects your understanding of our agreement and representation, please sign this Agreement and return it to me via FED EX at the address indicated above. I encourage you to keep a personal file of all documents from me. I will send you a copy of any document filed with the court or forwarded to opposing counsel or any other third party hired in this case.

KP00004

January 17, 2012
Page 5

I look forward to representing you and will keep you informed of all progress in this matter. It is my practice to attempt to return every telephone call made to me during a given day. However, sometimes that is impossible, as I may be in trial or involved in other matters. If you call and I am not available, you may leave a message or discuss your question with my legal assistant. Once again, I am pleased to have this opportunity to represent and assist you.

Sincerely,

CARSON BOXBERGER LLP


Kevin P. Podlaski

KPP/kjw


Acknowledged and Agreed to by:

Dated: ___1/18/2012___

(Printed Name of Client) (Social Security Number)

(Signature of Client)

F:\K\KPP\Military\Penguin Publishers\Engagement ltr.doc

KP00005