UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                             :

MATTHEW BISSONNETTE,                  :

                              Plaintiff,         :        14-CV-8810 (JMF)

                                           :

          -v-                          :        OPINION AND ORDER

                                         :

KEVIN PODLASKI, et al.,               :

                                         :

                           Defendants.     :

                                         :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Matthew Bissonnette is a retired — and highly decorated — Navy SEAL who

participated in the 2011 mission that killed Osama bin Laden, the leader of al Qaeda and the

architect of the September 11, 2001 terrorist attacks.  Under the pseudonym Mark Owen,

Plaintiff published a best-selling book about the mission titled *No Easy Day: The Firsthand*

*Account of the Mission that Killed Osama Bin Laden* in 2012.  The book apparently led the

Department of Justice ("DOJ") to investigate Plaintiff for violation of his contractual duties as a

Navy SEAL and the Department of Defense ("DOD") to threaten Plaintiff with a civil forfeiture.

In this case, Plaintiff brings suit against his former attorney Kevin Podlaski and Podlaski's

former firm, Carson Boxberger, LLP ("CB") (together, "Defendants"), alleging, *inter alia*, that

Defendants committed legal malpractice by advising him to forego pre-publication review of his

book by the DOD and other governmental agencies and by failing to properly review the book

for classified or otherwise sensitive information — actions that, he alleges, resulted in the DOJ

investigation and the DOD threat of legal action.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/07/2015

Defendants move to dismiss Plaintiff's Second Amended Complaint (the "Complaint"), pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, for lack of personal jurisdiction.  (Docket No. 36).  Significantly, the motion does not call upon the Court to wade into the merits of the parties' dispute, let alone the question of whether Plaintiff violated his contractual obligations or any laws in publishing *No Easy Day*.  Instead, the threshold question that faces the Court is whether Plaintiff can bring suit against Defendants, an Indiana attorney and an Indiana law firm, in this District.  Applying well-established and binding precedent, the Court concludes that he cannot.  Accordingly, and for the reasons stated below, Defendants' motion is granted, and the Complaint is dismissed in its entirety.

## BACKGROUND

The following facts, taken from the Complaint, are assumed to be true for the purposes of this motion.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009); *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

Plaintiff participated in many high-profile missions during thirteen consecutive combat deployments as a Navy SEAL, including, as noted, the 2011 mission that resulted in the death of Osama bin Laden.  (Second Am. Compl. (Docket No. 29) ("SAC") ¶ 15).  After witnessing media accounts of the missions in which he participated — descriptions that he believed to be inaccurate — Plaintiff decided to write his own account of the bin Laden raid, told from the perspective of the Navy SEALs themselves.  (*Id.* ¶ 16).  Plaintiff retained New York literary agent Elyse Cheney and her firm, Elyse Cheney Literary Associates LLC, and agreed to publish his book with Dutton, an imprint of Penguin Publishing Group based in New York City.  (*Id.* ¶¶ 9, 18).

2

Naturally, the subject matter of the proposed book created a risk that Plaintiff could inadvertently disclose confidential information — information that, if released, could pose a threat to the safety of deployed Navy SEALs and expose Plaintiff to criminal or civil liability for violation of nondisclosure agreements he signed during his time with the Navy.  (*Id.* ¶¶ 21-22). Accordingly, Dutton required Plaintiff to ensure that the manuscript he submitted to the publisher did not contain any such information and, to that end, agreed to pay a portion of legal fees in order to enable Plaintiff to secure attorney review of his manuscript.  (*Id.* ¶ 22; *id.*, Ex. 2 at 11).  Cheney then began searching for an attorney with the experience — and security clearance — to advise Plaintiff on what he could and could not publish.  (*Id.* ¶ 23).

Cheney's search led her to Podlaski, an attorney then affiliated with CB, a law practice based in Indiana.  (*Id.* ¶¶ 6-7, 23).  Cheney reached out to Podlaski — while she was in New York and he was in Indiana — via telephone and e-mail several times; over the course of those conversations, Podlaski "claimed to have a high level of security clearance, said he had vetted other books for retired military, and that he could advise Plaintiff and the support team of professionals assisting Plaintiff — Cheney, the co-writer, and Dutton — on legal issues arising from Plaintiff's desire to tell the story of the SEALs and comply with his confidentiality obligations."  (*Id.* ¶ 24).  In January 2012, Defendants drafted an engagement letter for Plaintiff, which they addressed and delivered to Cheney in New York.  (*Id.* ¶ 25).  To the extent relevant here, the letter provided that Defendants would assist Plaintiff with any legal issues he would encounter in

> [c]ontracting with Dutton, a division of Penguin Group (USA) Inc., 375 Hudson Street, New York, New York 10014 ("Publisher"), for the publication of your manuscript about your career as a member of the U.S. Navy SEALS; and reviewing the publishable manuscript of your career to ensure your compliance with your obligations under any agreements you may have signed with the U.S. Government not to release classified or classifiable information or otherwise

> compromise the national security interests of the United States, as those terms are
> used, intended or understood in Standard Form 312, Confidential Information
> Non-Disclosure Agreement ("CINA"), or any other such agreements.

(*Id.* ¶ 25; *id.*, Ex. 3 at 1).  The engagement letter further indicated that all legal bills were to be

sent to Cheney's office in New York City.  (*Id.* ¶ 25; *id.*, Ex. 3 at 2).  Defendants knew that the

contract "on which Defendants were advising Plaintiff[] was performable in New York, was

governed by the laws of New York, and fixed the exclusive venue of any dispute as" this Court.

(*Id.* ¶ 26).

In January and February 2012, Defendants reviewed Plaintiff's contract with Dutton and

suggested several revisions during conferences with Cheney, including one change that added

Podlaski by name in the section concerning attorney review of the manuscript.  (*Id.* ¶¶ 27, 29;

*id.*, Ex. 2 at 11).  The contract, as executed, specified that courts in the Southern District of New

York "shall have sole and exclusive jurisdiction to hear and determine any suit, action,

proceeding, claim, controversy or dispute arising under or concerning this Agreement

exclusively between" Dutton and Plaintiff.  (*Id.*, Ex. 2 at 13).[1]  Notably, Defendants did not

suggest any revisions to the Dutton contract to account for delays in the event that the U.S.

Government wished to edit or redact Plaintiff's manuscript.  (*Id.* ¶ 28).

In June 2012, after the Dutton contract was finalized, Defendants turned to their second

obligation under the engagement letter with Plaintiff: reviewing Plaintiff's manuscript to ensure

it was free of confidential information.  (*Id.* ¶¶ 31, 41).  Significantly, despite his representations

to the contrary, Podlaski did not have the security clearance to read and edit Plaintiff's

manuscript; indeed, according to Plaintiff, "there is no level of security clearance that would

---

[1]     The copy of the contract attached to the Complaint is not signed by Plaintiff, but there
appears to be no dispute that it was a valid and binding contract.

have permitted [Podlaski] to read the unedited Book without the authorization of the Department of Defense — which he lacked."  (*Id.* ¶ 40).  Accordingly, "[b]y requesting that Plaintiff send him a copy of the raw manuscript, Podlaski exposed [Plaintiff] to criminal prosecution because Plaintiff gave Podlaski confidential information he was not authorized to receive or possess." (*Id.* ¶ 40).

   In addition, Defendants repeatedly advised Plaintiff and Cheney that Plaintiff did not, and in fact should not, submit his manuscript to the Government for pre-publication review, but rather should rely on Defendants to remove sensitive information.  (*Id.* ¶¶ 35-36).  Defendants' advice on this score was based largely on Podlaski's belief that, because Plaintiff was not on active duty when he wrote the book, he had no contractual obligation to submit it for pre-publication review — even though, Plaintiff alleges, Podlaski did not know the exact date that the manuscript was written, the exact date that Plaintiff left active service, or even the agreements that someone in Plaintiff's position would have signed.  (*Id.* ¶¶ 35, 47; *id.*, Ex. 10 at 1).  Further, Defendants repeatedly downplayed the risks of not submitting Plaintiff's manuscript for pre-publication review, as Podlaski argued that any advice rendered by the DOD office charged with reviewing official DOD information for release to the public was only "advisory in nature" with respect to information revealed by former Government employees, which, as noted, Podlaski understood Plaintiff to be.  (*Id.*, Ex. 9 at 1).

   In the weeks leading up to the release of *No Easy Day*, publicity — and controversy — surrounding the book began to build.  (*Id.* ¶ 45).  Members of the media, including the *New York Times*, contacted Cheney and Dutton several times asking for comment on information reporters had received from government sources that the Government was considering filing civil and criminal charges against Plaintiff because of his intended disclosure of confidential information.

(*Id.*).  Plaintiff's publishing team forwarded these inquiries to Podlaski, who repeatedly assured the Cheney and Dutton that pre-publication review was unnecessary; that the manuscript was free of confidential information; that the information contained in the book was substantially similar to that revealed in a prior *New Yorker* article in any event; and that all the inquiries were "hand wringing prior to anybody reading the book." (*Id.*, Ex. 9 at 1; *id.* ¶ 46).

On August 30, 2012 — one business day prior to the book's planned release — Jeh Johnson, then general counsel of the DOD (and now Secretary of Homeland Security), wrote to Plaintiff through Dutton, confirming what the recent press inquiries had suggested: that the Government viewed the planned release to be in violation of Plaintiff's obligations to the Government.  (*Id.* ¶ 48).  When Cheney forwarded Johnson's letter to Podlaski, he again maintained that Plaintiff was not in violation of any duties he had to the Government, and "suggested that everyone embrace the accusations against Plaintiff because it would result in greater book sales." (*Id.* ¶ 49).  Plaintiff alleges that he and Dutton "had no choice" but to rely on Podlaski's advice and to proceed with the book's release, as tens of thousands of copies had already been published and distributed across the country, and Plaintiff would be in material breach of his contract with Dutton if he attempted to block the book's publication.  (*Id.* ¶ 50).  Dutton released *No Easy Day*, as planned, on September 4, 2012.  (*Id.* ¶ 51).

Following the book's release, the Government took swift action to investigate Plaintiff.  The DOJ launched an investigation to determine if Plaintiff had violated any criminal laws by publishing the book, and the DOD threatened a civil forfeiture action to recover all profits obtained from book sales.  (*Id.* ¶ 52).  In response to the DOJ investigation, Plaintiff told the Government that he had relied on Podlaski's advice in foregoing pre-publication review, informed Defendants that he was waiving his attorney-client privilege, and requested that

Defendants produce his client file to the Government.  Although, upon Plaintiff's request, Podlaski met with Government officials in connection with the investigation, Defendants waited several months to hand over Plaintiff's file, and to this day have not produced his entire file.  (*Id.* ¶¶ 54-57).

Plaintiff alleges that, but for Defendants' deficient legal advice, he would have submitted a draft of *No Easy Day* to the Government for pre-publication review, and — citing several books that have successfully undergone such a process and were released to the public — that review would not have prevented him from publishing and marketing the book.  (*Id.* ¶ 59). Instead, and as a direct result of Defendants' conduct, Plaintiff has had to defend against the DOJ investigation and the threatened DOD civil forfeiture action, which has required him to obtain new counsel at significant cost; has lost his security clearance; and has lost future employment opportunities.  (*Id.* ¶¶ 60-64).  Because of these losses, Plaintiff brings this action for legal malpractice and breach of Defendants' fiduciary duty to Plaintiff.

## LEGAL STANDARDS

It is well established that a plaintiff bears the burden of establishing a court's personal jurisdiction over a particular defendant.  *See, e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  The showing a plaintiff must make, however, "'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Where, as here, a court "chooses not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials."  *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 930 (2d Cir. 1988); *accord Dorchester Fin. Secs.*, 722 F.3d at 84.

Such a showing "entails making 'legally sufficient allegations' . . . including 'an averment of facts that, if credited, would suffice'" to establish that jurisdiction exists.  *Penguin Grp.,* 609 F.3d at 35 (quoting *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)).  A court must therefore view all facts in the light most favorable to the plaintiff. *See, e.g.*, *TradeComet.com LLC v. Google, Inc.,* 647 F.3d 472, 475 (2d Cir. 2011).

## DISCUSSION

Where, as in this case, subject-matter jurisdiction is premised on diversity of citizenship, a court must generally "conduct a two-part inquiry when considering a motion to dismiss for lack of personal jurisdiction.  First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process."  *Kernan v. Kurz-Hastings, Inc*., 175 F.3d 236, 240 (2d Cir. 1999) (internal quotation marks omitted); *see also, e.g.*, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006).  However, "[e]xcept where the long-arm statute permits jurisdiction to the extent permitted by principles of Due Process — as it commonly does in states other than New York — analysis under Due Process principles is not necessary unless there is long-arm jurisdiction under the applicable state statute."  *Penguin Grp.*, 609 F.3d at 35.  Accordingly, the Court begins by analyzing whether there is personal jurisdiction over Defendants under New York law — specifically, under New York's long-arm statute, N.Y. C.P.L.R. Section 302(a). Plaintiff relies on three subsections of the statute, each of which the Court addresses in turn.

## A.  Section 302(a)(1)

Plaintiff relies first on Section 302(a)(1), which confers jurisdiction over a non-domiciliary who "in person or through an agent . . . transacts any business within the state or

contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. 302(a)(1).   (Mem.

Law Kevin Podlaski & Carson Boxberger LLP Supp. Mot. To Dismiss Second Am. Compl.

Pursuant Rs. 12(b)(2), 12(b)(3) Alternatively, R. 12(b)(6) (Docket No. 37) ("Defs.' Mem.") 9-

14).   "[T]he overriding criterion necessary to establish a transaction of business is some act by

which the defendant purposefully avails itself of the privilege of conducting activities within

New York." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir.

2012).  The test "is hardly a precise one; the court must look at the aggregation of defendant's

activities, coupled with the selective weighing of the various actions." *Eastboro Found.*

*Charitable Trust v. Penzer*, 950 F. Supp. 2d 648, 658 (S.D.N.Y. 2013) (internal quotation marks

omitted).  "Moreover, it is the nature and quality, and not the amount of New York contacts

[which] must be considered by the court." *Id.* (internal quotation marks omitted); *see also Grant*

*& Eisenhofer, P.A. v. Bernstein Liebhard LLP*, 14-CV-9839 (JMF), 2015 WL 5751252, at *4-5

(S.D.N.Y. Sept. 30, 2015).   In cases such as this one, involving a contract executed in New

York, "[t]he proper inquiry . . . is whether looking at the totality of the defendant's activities

within the forum, purposeful acts have been performed in New York by the foreign corporation

in relation to the contract, albeit preliminary or subsequent to its execution." *Sterling Nat. Bank*

*& Trust Co. of New York v. Fid. Mortgage Inv.*, 510 F.2d 870, 873 (2d Cir. 1975) (internal

quotation marks omitted).

    As the Second Circuit has observed, "lawyers and other professionals today transact

business with their pens, their fax machines and their conference calls — not with their feet."

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787-88 (2d Cir. 1999)

(internal quotation marks omitted).  Accordingly, "[t]he fact that the defendant was never present

in New York in connection with the contract sued on is not dispositive" of the Section 302(a)(1)

inquiry.  *Mayes v. Leipziger*, 674 F.2d 178, 184 (2d Cir. 1982).  At the same time, New York

courts "have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of

defendant's communication from another locale with a party in New York."  *Beacon*

*Enterprises, Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983).  Indeed, "even substantial

negotiations conducted by mail, telephone, or electronic communications often do not confer

jurisdiction."  *Penn Grp., LLC v. Slater*, No. 07-CV-729 (MHD), 2007 WL 2020099, at *10

(S.D.N.Y. June 13, 2007).  Instead, as Plaintiff acknowledges (Response Defs.' Mot. To Dismiss

Pl.'s Second Am. Compl. (Docket No. 47) ("Pl.'s Mem.") 14), such communications confer

jurisdiction over a defendant only if, through them, "the defendant projects itself into New York

events" and "can be said to have engaged in extensive purposeful activity in New York."

*Stengel v. Black*, No. 03-CV-495 (GEL), 2003 WL 1961638, at *2 n.2 (S.D.N.Y. Apr. 25, 2003)

(internal citation and quotation marks omitted); *see also Grant & Eisenhofer*, 2015 WL 5751252,

at *4 (describing the requirement under New York law that "out-of-state communications can

create a sufficient basis for Section 302(a)(1) jurisdiction if the defendant takes some initiative in

creating the connection with a New York party in the first place"); *Aquiline Capital Partners*

*LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (noting that what 302(a)(1)

requires is that the "defendant's direct and personal involvement on [its] own initiative projected

[itself] into New York to engage in a sustained and substantial transaction of business" (internal

quotation marks and alterations omitted)).

    The Second Circuit's decision in *Bank Brussels Lambert* is particularly instructive here.

In that case, the New York-based plaintiff had recruited the defendant, a Puerto-Rico based law

firm, to provide an opinion for a revolving credit agreement ("RCA").  A draft RCA provided to

the defendant firm indicated that the agreement would be governed by New York law and

contained a New York choice-of-forum provision; additionally, while drafting its opinion, the defendant firm communicated with the clients or their counsel in New York to discuss the opinion, and also responded to inquiries from those parties before transmitting its final opinion to the banks in New York. *See* 171 F.3d at 782-83. Nevertheless, the district court — and, in turn, the Court of Appeals — held that the firm's involvement in the New York transaction did not constitute a "transaction of business" sufficient to confer personal jurisdiction in New York. Comparing the facts to those in *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506 (N.Y. 1970) — where a defendant requested the use of an open telephone line to participate in a New York auction and was found to have engaged in business transactions in New York as a result — the Second Circuit reasoned: "In none of [the firm's] communications did [it], like the defendant in *Parke-Bernet*, project itself into New York to participate in any activities localized in the state or to represent the banks during any New York transactions." 171 F.3d at 788. Further, although the defendant had provided legal advice related to a New York transaction, was aware that any disputes regarding the transaction would occur in New York and would be governed by New York law, and was mentioned by name in a contract that was executed in New York, the Second Circuit concluded that the defendant had not contracted to provide services in New York. *Id.* Because the defendant was not involved in the closing of the RCA itself, and its duties did not involve any representation in connection with the closing, "all of the relevant services . . . were in fact performed in Puerto Rico," and jurisdiction under Section 302(a)(1) was found wanting. *Id.* at 789; *see also Mayes*, 674 F.2d at 184-85 (holding that there was no personal jurisdiction over the defendants, California lawyers who were solicited by the New York plaintiff to represent him in a California action, even though the defendants had repeatedly communicated by phone and mail with the plaintiff's local counsel in New York and had negotiated the terms of

a contract for representation with that New York attorney); *Grant & Eisenhofer*, 2015 WL

5751252, at \*5 (dismissing claims against an Ohio law firm for lack of personal jurisdiction

where the firm had been retained by Ohio litigants and exchanged some communications with

another firm based in New York).

      Applying those standards here, the Court is compelled to conclude that Defendants'

activities do not suffice to confer jurisdiction under Section 302(a)(1).  Defendants did not solicit

the business of Plaintiff, his New York-based publisher, or his New York-based agent; instead,

Cheney reached out to Podlaski while he was in Indiana.  Additionally, Defendants never

traveled to New York, even for a day; instead, all communications between Defendants and

Plaintiff, Plaintiff's agent, and Plaintiff's publisher took place from Indiana.  At bottom, here, as

in *Bank Brussels Lambert*, the conduct at issue is the provision of legal services — specifically,

the performance of legal research and the rendering of legal advice — from outside of New

York.  *See Bank Brussels Lambert*, 171 F.3d at 787 (finding no personal jurisdiction because,

among other things, the defendant law firm "performed all of its legal research and writing

services in preparing [an] opinion and closing the relevant security documents in Puerto Rico,

and none of its partners or agents either entered New York or were required to be physically

present to perform any of these services"); *Mayes*, 674 F.2d at 184-85 ("[N]o court has extended

§ 302(a)(1) to reach a nondomiciliary who never entered New York, who was solicited outside of

New York to perform services outside of New York, who performed outside of New York such

services as were performed, and who is alleged to have neglected to perform other services

outside of New York."); *see also Lombardi v. Paige*, No. 00-CV-2605 (RCC), 2001 WL 303831,

at \*4 (S.D.N.Y. Mar. 28, 2001) (finding no jurisdiction under Section 302(a)(1) because

"Defendant agreed to represent Plaintiffs and entered into a retainer agreement with each of them

after they approached her . . . .  It appears her office made a few, sporadic efforts to collect information [in New York] in furtherance of Plaintiffs' claims.  Defendant did nothing else.  She did not solicit business in New York, she is not licensed in New York and, as Plaintiffs are well aware, she did not file a lawsuit in New York."); *Stair v. Calhoun*, No. 07-CV-03906 (JFB) (ETB), 2009 WL 792189, at *7 (E.D.N.Y. Mar. 23, 2009) (ruling that Section 302(a)(1) did not confer personal jurisdiction over the defendants because "[n]owhere in the complaint do [the] plaintiffs allege that the Bornn defendants ever traveled to New York in connection with their representation, negotiated their retainer agreement in New York, or performed their services in New York"); *Twine v. Levy*, 746 F. Supp. 1202, 1205 (E.D.N.Y. 1990) (finding no personal jurisdiction under Section 302(a)(1) because, among other things, the defendants "did not solicit plaintiff's business in New York.  The letters and phone calls from defendant Levy to plaintiff were simply necessary communications between defendants and their client.").  Put simply, "[D]efendants did not, in any meaningful sense, project themselves into New York's pool of competing legal services" through their activities in New York.  *Twine*, 746 F. Supp. at 1205.

The fact that aspects of the underlying transaction in this case took place in New York or involved New York law does not call for a different conclusion.  Defendants' engagement letter expressly limited their representation of Plaintiff to "assist[ing him] with the legal issues [he] may encounter in [] [c]ontracting with Dutton" and "[r]eviewing the publishable manuscript of [his] career to ensure [his] compliance" with nondisclosure obligations.  (SAC, Ex. 3 at 1).  Although Defendants provided Plaintiff, through Cheney, with suggested revisions to Plaintiff's contract with Dutton, and *that* contract was governed by New York law, Defendants' own engagement letter was not governed by New York law, nor (more importantly) did Defendants agree to provide, or actually provide, representation in New York related to the contract.

Accordingly, Defendants, like the defendant in *Bank Brussels Lambert*, never "projected themselves" into the underlying New York transaction by, for example, actively and extensively negotiating the Dutton contract on behalf of Plaintiff in New York in the first instance.  (*See* SAC ¶¶ 22-24 (describing Cheney as seeking out and making initial contact with Defendants in conjunction with Dutton's agreement to pay for legal fees)).  *Cf. Liberatore v. Calvino*, 742 N.Y.S.2d 291, 293 (1st Dep't 2002) (finding jurisdiction under 302(a)(1) where out-of-state attorney "projected himself into the State . . . by contracting with plaintiff to legally represent her here for purposes of obtaining a favorable settlement of her New York personal injury claim from New York tortfeasors in accordance with New York law" and "purposefully pursuing redress for plaintiff over a three-year period from various New York entities.").  Further, Defendants' communications into New York related to its second task — reviewing the book for confidential information — were limited, as in *Bank Brussels Lambert*, to consulting with Plaintiff, his publishing team, and counsel on Plaintiff's obligations to the government and responding to inquiries regarding the same.  *See Bank Brussels Lambert*, 171 F.3d at 782-83.

In short, Defendants did what they were hired to do: provide advice to Plaintiff on a contract with a New York-based publisher for a book set for national publication, and communicate with Plaintiff's team in New York regarding Plaintiff's nondisclosure obligations. What they did *not* do is solicit the relationship, use communications into New York to insert themselves into localized business transactions, or "engage in extensive purposeful activity here without ever actually setting foot in the State."  *Parke-Bernet Galleries*, 256 N.E.2d at 508. Although the 302(a)(1) test is "hardly a precise one," *Eastboro Found.*, 950 F. Supp. 2d at 658 (internal quotation marks omitted), the Court finds that Defendants' communications into New

York fail to rise to the level necessary to confer jurisdiction under that subsection of the long-arm statute.

## B.  Section 302(a)(2)

Next, Plaintiff relies on Section 302(a)(2), which confers jurisdiction over defendants who "commit[] a tortious act within the state."  (Pl.'s Mem. 7-8).  Although Plaintiff asserts that jurisdiction over Defendants under Section 302(a)(2) is "uncontested," his argument can be swiftly rejected.  With possible exceptions not relevant here, *see Int'l Diamond Importers, Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 520 n.170 (S.D.N.Y. 2014), a "'defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2),'" *Elsevier, Inc. v. Grossman*, No. 12-CV-5121 (KPF), 2015 WL 72604, at *8 (S.D.N.Y. Jan. 5, 2015) (quoting *Bank Brussels Lambert*, 171 F.3d at 790)).  Here, as Plaintiff concedes, neither Podlaski nor any of CB's agents was physically present in New York when the alleged acts of malpractice were committed.  (Pl.'s Mem. 2).  Accordingly, the Court cannot exercise jurisdiction over Defendants pursuant to Section 302(a)(2).

## C.  Section 302(a)(3)

Finally, the Court turns to Plaintiff's argument for personal jurisdiction under Section 302(a)(3)(ii), which confers jurisdiction over a defendant who "commits a tortious act without the state causing injury to person or property within the state" and "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. § 302(a)(3)(ii).  As the New York Court of Appeals has explained, "conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that

defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce." *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000).

 With respect to the fourth element, courts have emphasized that "'[t]he test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than a subjective one.'" *Cortlandt Racquet Club, Inc. v. Oy Saunatec, Ltd.*, 978 F. Supp. 520, 523 (S.D.N.Y. 1997) (quoting *Allen v. Auto Specialties Mfg. Co.*, 357 N.Y.S.2d 547 (3d Dept. 1974)).  Further, the "mere foreseeability of in-state consequence and failure to avert that consequence is not sufficient to establish personal jurisdiction under New York's long-arm statute." *Id.*  Instead, because "New York courts have sought to avoid conflict with federal constitutional due process limits on state court jurisdiction by applying the 'reasonable expectation' requirement in a manner consistent with United States Supreme Court precedent," *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999), "foreseeability must be coupled with evidence of a purposeful New York affiliation," such as "a discernible effort to directly or indirectly serve the New York market," *Schaadt v. T.W. Kutter, Inc.*, 564 N.Y.S.2d 865, 866 (3d Dep't 1991).  Put another way, in order to establish long-arm jurisdiction under Section 302(a)(3)(ii) (not to mention the Due Process Clause), "purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required." *Kernan*, 175 F.3d at 241.[2]

---

[2] There is some uncertainty regarding whether the foreseeability element of Section 302(a)(3)(ii) continues to require a showing of purposeful availment.  In *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 215 (2000), the Court of Appeals notably omitted any discussion of purposeful availment in conducting its analysis of personal jurisdiction under Section 302(a)(3)(ii), leading the Second Circuit to question without deciding whether *Kernan* had effectively been overruled.  *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 n.3 (2d Cir. 2002); *see also Ingraham v. Carroll*, 90 N.Y.2d 592, 598 (1997)

In light of these standards, Plaintiff's argument for jurisdiction under Section 302(a)(3)(ii) fails for similar reasons as that his argument under Section 302(a)(1) failed.  Put simply, Plaintiff alleges no facts to demonstrate that Defendants aimed any of their business or legal activities at consumers in New York or otherwise purposefully availed themselves of the privilege of this state's laws, such that they should have expected to be haled into court within the state.  As noted above, Defendants never actively represented Plaintiff in New York proceedings or agreed that their *own* contract with Plaintiff would be governed by New York law; instead, they merely advised Plaintiff on two discrete matters relating to a book that was to be published through a New York publishing house.  *See Astor Holdings, Inc. v. Steefel, Levitt & Weiss, P.C.*, No. 03-CV-1242 (SAS), 2003 WL 21108316, at *5 (S.D.N.Y. May 14, 2003) (noting that "[g]iven the circumstances surrounding [the attorney's] trip to New York, it is unlikely that [the firm] purposefully availed itself of New York as a forum during its representation," as the attorney averred that "[d]uring the course of [the] firm's representation . . . at no time did [he] ever agree on [the firm's] behalf to subject the firm to the jurisdiction of the courts of the State of New York nor to be subject to or have disputes resolved in accordance with New York law, nor to utilize New York as a forum for dispute resolution."); *cf. Ingraham*, 90 N.Y.2d at 598 (holding that the foreseeability prong of Section 302(a)(3)(ii) was met where

---

(omitting purposeful availment in discussing the foreseeability of defendant's actions causing injury in New York).  Nevertheless, as one district court noted, the *LaMarca* court based part of its finding of jurisdiction on the defendant's use of New York business contacts and its business activity directed specifically at New York, "suggest[ing] strongly that the Court of Appeals continues to consider purposeful availment an element of the interstate commerce analysis for long arm jurisdictional purposes."  *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-CV-4695 (LTS) (HBP), 2003 WL 21467544, at *7 (S.D.N.Y. June 25, 2003).  Moreover, purposeful availment is necessary for an exercise of personal jurisdiction to comport with due process in any event, *see Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 243 n.4 (S.D.N.Y. 2010), so the Court need not decide the issue here.

the defendant, an out-of-state doctor, "concededly" had been "aware that decedent, a New York resident, was receiving treatment from New York State primary physicians based, at least in part on his recommendations" and had "contacted decedent's physicians directly, by mail and by telephone, concerning the treatment she was to receive in New York").

Additionally, Plaintiff "point[s] to no actions or meetings that took place in New York" other than the correspondence from Defendants to Plaintiff's publishing team in New York — correspondence that, as the Court already has held, did not constitute purposeful business activity aimed at New York. *Lipson v. Birch*, 46 F. Supp. 3d 206, 219 (E.D.N.Y. 2014); *see Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 935 F. Supp. 2d 615, 627 (S.D.N.Y. 2013) (concluding that while a fashion team's trips to New York and decision to send samples to fashion editors "demonstrate an attempt to attract publicity for Defendants' products — an attempt that was unsuccessful —there is no evidence that these meetings were directed at the New York market").  Finally, Plaintiff does not allege that Defendants had other business dealings or clients in New York; instead, he asserts only that CB advertises its practice as one that provides representation to clients "throughout [Indiana] and nationwide."  (Pl.'s Mem. 6).  Without any evidence that Defendants used their website or other promotional materials to interact with or solicit New York clients, the mere characterization of Defendants' practice as "nationwide" does not suffice to establish purposeful availment of the privilege of doing business in New York.  *See Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 424 (S.D.N.Y. 2009) (finding that the plaintiff had not established that, through their website, "defendants purposefully targeted New York's Indian American population or otherwise targeted their activities toward the state"); *cf. Parker Waichman Alonso LLP v. Orlando Firm, P.C.*, No. 09-CV-7401 (CM), 2010 WL 1956871, at *10 (S.D.N.Y. May 14, 2010) (finding "tangible

manifestations" of the defendants' attempt to reach the New York market through "its statement on its home page that it helps customers 'across the country,' and its act of signing up six New York clients who allegedly got to it via the website"); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007) (stating that, in analyzing personal jurisdiction under Section 302(a)(1) based on e-commerce, the touchstone remains "whether the defendant, through the website, purposefully avail[ed] himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws" (internal quotation marks omitted)).

Plaintiffs repeatedly assert that Defendants "knew" their activities could have consequences in New York.  (Pl.'s Mem. 8, 15-16).  But for an exercise of jurisdiction to comport with Section 302(a)(3)(ii) — and, significantly, with due process more generally — mere knowledge is not enough.  *See, e.g.*, *Walden v. Fiore*, 134 S.Ct. 1115, 1125 (2014) (dismissing for lack of jurisdiction a defendant who "did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections"); *Kejriwal v. UCO Bank*, 12-CV-7507 (MHD), 2014 WL 116218, at *9 (S.D.N.Y. Jan. 10, 2014) (finding no jurisdiction under Section 302(a)(3)(ii) despite allegations that the defendant "may have known" of plaintiff's connection to New York); *Westvaco Corp. v. Viva Magnetics Ltd.*, 00-CV-9399 (LTS) (KNF), 2002 WL 1933756, at *4 (S.D.N.Y. Aug. 20, 2002) (noting that "caselaw suggests . . . that CPLR 302(a)(3)(ii) requires something more than knowledge").  Instead, as noted, a defendant must purposefully avail itself of the privileges of doing business in New York.  *See Carpino v. Nat'l Store Fixtures Inc.*, 712 N.Y.S.2d 684, 686 (3d Dep't 2000) (finding that even if the requirements of Section 302(a)(3)(ii) had been met, "due process principles preclude a finding that New York may exercise jurisdiction over" the defendant, because "none of [the defendant's] seven production facilities or three sales offices

19

are in New York," it "maintains no telephone listing or bank account in New York," and there is "no indication that [it] pursued any purposeful affiliation with New York"). As Defendants did not engage in any such activity, either through the conduct at issue in this lawsuit or otherwise, it follows that the Court cannot exercise jurisdiction over them under Section 302(a)(3)(ii).

## CONCLUSION

For the foregoing reasons, the Complaint is dismissed for lack of personal jurisdiction. Although Plaintiff, in passing, requests leave to amend his Complaint (Pl.'s Mem. 25), the Court denies the request. It is "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and a district court may deny leave to amend when, as here, amendment would be futile because the problem with the claim "is substantive . . . [and] better pleading will not cure it," *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Further, Plaintiff was previously granted leave to amend to cure deficiencies raised in Defendant's motion to dismiss, and was explicitly cautioned that he "w[ould] not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." (Docket No. 24). What is more, Plaintiff has not "given any indication that he is in possession of facts that would cure the problems" identified above. *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014).

The Clerk of Court is directed to terminate Docket No. 36 and to close the case.

SO ORDERED.

Date: October 7, 2015
      New York, New York

JESSE M. FURMAN
United States District Judge

20